IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| Melody Eadie, | ) |
|           Plaintiff, | ) Civil Action No. 8:07-3406-HMH-WMC |
| | ) |
|       vs. | ) **REPORT OF MAGISTRATE JUDGE** |
| | ) |
| Anderson County Disabilities | ) |
| and Special Needs Board, | ) |
| | ) |
|          Defendant. | ) |
| | ) |

This matter is before the court on the defendant's motion for summary judgment. The plaintiff alleges that her former employer, the Anderson County Disabilities and Special Needs Board ("the Board"), violated public policy by terminating her employment because she reported suspected abuse.  She also alleges that she was terminated from employment because of her race and in retaliation for her report of alleged racial discrimination, all in violation of Title VII of the Civil Rights Act of 1964, as amended.  The plaintiff further alleges that the defendant violated the Family and Medical Leave Act ("FMLA") by terminating her employment based on her request for and use of FMLA leave.

Pursuant to the Provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

## FACTS PRESENTED

The plaintiff, a white female, began her employment with the Board in 2000, working third shift in a residential facility (pl. dep. 15).  In or around April of 2002, the plaintiff was hired to be a One-on-One Day Program Specialist for a consumer named Maurice, who has special needs including mental retardation and autism.  Maurice had previously been

receiving respite (or home) care from the Board, and the Board wanted to bring him into the Work Activity Center ("WAC") in order to provide additional services to him, including socialization and work training (Clark Nesbitt aff. ¶ 5). The plaintiff's position as a One-on-One required her to provide direct care training to Maurice at all times. Essentially, the position required the plaintiff to be with Maurice all day and to assist him and manage him in any way needed, including but not limited to his behavior, hygiene, and meals (Nesbitt aff. ¶ 8).

The plaintiff's position was full-time temporary, which did not typically include health and dental benefits, but special accommodation was made to provide such benefits to the plaintiff because of Maurice's perceived extra special needs. In addition, the Board requested and received additional outlier funding from the South Carolina Department of Disabilities and Special Needs Board in order to be able to pay the plaintiff $12.00 an hour, even though the typical starting salary of a comparable employee at that time was $8.00 an hour (Nesbitt aff. ¶¶ 6-7).

On June 15, 2006, the Board's Human Resource Manager, Martha Jones, a white female, met with the plaintiff[1] at the plaintiff's request (Martha Jones aff. ¶ 4). During the meeting, the plaintiff complained about perceived mistreatment by management and co-workers (Jones aff. ¶ 5). According to the plaintiff, she did not tell Martha Jones that she felt she was being treated differently because she was white and her supervisors were black (pl. dep. 73-75). Among other things, the plaintiff was upset about a written warning she had received on June 13, 2006. She was also upset about riding the van with Maurice. In that meeting, the plaintiff brought up an incident of alleged abuse (the "abuse incident") that she stated had occurred approximately one year before (Jones aff. ¶¶ 5-6).

The plaintiff claims that the suspected abuse incident involved two black employees, Joann Whitner and Loretta Burton, whom she felt might have been too rough and gone too far in physically restraining a vulnerable adult in the care of the defendant (pl. dep.

---

[1]The plaintiff states in her memorandum that her husband was present at this meeting (pl. resp. m.s.j. 18); however, it is unclear from the evidence whether or not he was present.

55).  According to the plaintiff, at that time, the defendant did not have a policy instructing employees to make reports in accordance with the Adult Protection Act.  Instead, the defendant's procedure required that an employee suspecting abuse do as she did – report it to her supervisor or to Human Resources (Jones dep. 14; Terri Abernathy dep. 8).

As a result of the meeting with the plaintiff, Martha Jones investigated the alleged abuse incident and determined that the plaintiff had talked to a supervisor approximately two years earlier about an incident, but that the plaintiff had specifically stated she was not reporting abuse and had not reported the abuse as required by the Board's policies and South Carolina law.  Martha Jones took the plaintiff to the Anderson County Sheriff's Office to file a report (Jones aff. ¶ 6; pl. dep. 62-63).  However, the investigation by the Sheriff's Department was stopped at the plaintiff's request (pl. dep. 64-65).

The defendant's Residential Director, Mary Burts, noted that, based on her 28 years of experience with the defendant, it would be very unusual for an employee to report suspected abuse without the defendant creating some documentation that a report had been made (Burts dep. 10).  Further, Burts noted that the defendant's policy requires that the name of the reporter must be kept confidential (Burts dep. 10).  However, in a subsequent staff meeting where the topic of restraining consumers was being discussed, Whitner called the plaintiff a "Snoop Dog" in a derogative manner, but was not disciplined in any way (pl. dep. 56; Whitner dep. 22-23; Abernathy dep. 17-19).

The plaintiff claims that she requested the meeting with Jones to report "all of the incidents" of the treatment to which she had been subjected (pl. dep. 48, 58, 66).  She reported that she was subjected to vulgar rap music on the defendant's van (pl. dep. 49).  She mentioned the earlier report of abuse, as well as her belief that the supervisors let it be known that she had been the reporter (pl. dep. 58).  She told Jones about the supervisors letting one of the black employees she accused refer to her as a "Snoop Dog" during a meeting where reporting abuse was being discussed (pl. dep. 71; Jones dep. 26). Further, she told Jones that she had been referred to as a "country hick" by a black supervisor, who said to her, "I don't

3

believe you are understanding what I'm saying, so let me put it in a country hick kind of way" (pl. dep. 66-67, 71, 76). The plaintiff also identified to Jones another white employee whom she felt was being "dogged on" (Jones dep. 27). The plaintiff told Jones about an incident in which Terri Abernathy, her supervisor, hid in the bushes and spied on her as she took consumers on a walk (Jones dep. 28; Abernathy dep. 6-7). The plaintiff also told Jones about an incident in which her supervisor instructed her to leave work and go to a unrelated store to ask for an employment application to "test" whether the store was discriminating against black applicants (pl. dep. 77-79).

On June 19, 2006, the defendant required the plaintiff to meet with Jones, Clark Nesbitt (Director of Day Services), her supervisor Terri Abernathy, and Lynn Bowie (Documentation and Records Coordinator), all of whom, except Jones, are black (pl. dep. 73). The plaintiff told the others that she felt she had been treated unfairly (Jones dep. 12; Abernathy dep. 12). During this meeting, Jones stated, "Well, there is one thing, Melody. You said they were black and you were white" (pl. dep. 73-74). Jones testified that it was possible that she asked the plaintiff whether "it" was because of race, because the plaintiff is white and her supervisors were black (Jones dep. 63). Jones also stated that it was possible she did say, "Melody, there is an issue I feel like we need to address. While talking with me the other day, you mentioned you were white and they were black" (Jones dep. 81). Bowie testified that she "vaguely" recalled Jones having made this statement (Bowie dep. 24). Abernathy testified that in the meeting that took place with the plaintiff, Jones, Nesbitt, and Bowie, the plaintiff raised an issue or concern about being treated differently based on her race (Abernathy dep. 65). She noted specifically, "Everybody was shocked that she would have said something like that. That's the first time, you know, first time we had heard it" (Abernathy dep. 65).

On July 17, 2006, the plaintiff received a memorandum from Nesbitt addressing her request to not have to ride the van with Maurice. The memo stated that effective July 18, 2006, Maurice would ride the van without the plaintiff's supervision. The memo stated that the

4

plaintiff was to have one 15-minute personal break without Maurice and reiterated that she was to be no more than three yards away from Maurice at all times (Nesbitt aff. ¶¶ 10-11, ex. N).

On July 19, 2006, after seeing the plaintiff on numerous occasions (both on that day and over a period of time) away from Maurice and taking unauthorized breaks, Nesbitt gave the plaintiff a memorandum that her personal break was to be from 10:35 a.m. until 10:50 a.m. (Nesbitt aff., ex. O; Nesbitt dep. 10-11).  The plaintiff admits that she received the memo on July 19, 2006, and that she had a smoke break that morning (pl. dep. 102-103).  Nesbitt told the plaintiff that the break time designated in the memorandum was effective immediately (Nesbitt dep. 11).  The plaintiff admits that she received the memo before taking a second smoke break at approximately 2:05 p.m. (pl. dep. 103).  On July 19, 2006, Nesbitt saw the plaintiff on numerous occasions away from Maurice and saw her taking a second, unauthorized smoke break at approximately 2:05 p.m.  Based thereon, he prepared a written warning to the plaintiff (Nesbitt aff. ¶¶ 10-11, ex. P; Nesbitt dep. 10-11, 14-16).  Nesbitt asked that Jones be present when he gave her the written warning (Nesbitt dep. 29-30).  During the meeting, the plaintiff became very argumentative, and Jones asked the plaintiff to return to her work station.  When plaintiff refused, Jones, Nesbitt, and Lynn Bowie all left Nesbitt's office, with the plaintiff still sitting there and refusing to leave (Jones aff. ¶¶ 7-8; Nesbitt dep. 18-19).

In Jones' opinion, the plaintiff's actions and behavior during the July 19, 2006, meeting constituted insubordination and disregard of authority.  Based thereon, Jones returned to her office and reviewed the plaintiff's file, which Jones testified revealed repeated insubordination, failure to perform her assigned duties, not displaying a good attitude toward co-workers and supervisors, leaving her work station without permission, leaving her individual consumer unattended, and the receipt of four warnings in two years. After speaking with the Board's Executive Director, Jones made the decision to terminate the plaintiff's employment (Jones aff. ¶¶ 8-10).

Between July 2002, and June 15, 2006, the defendant created eight documents relating to corrective or disciplinary action issued to the plaintiff (*see* pl. resp. m.s.j. 17-18;

5

Nesbitt aff., ex. A-P).  Between the  plaintiff's June 15, 2006, meeting with Jones and her termination on July 19, 2006, a one-month period, the defendant created 13 negative documents regarding the plaintiff, including one set of supervisor's notes, three observation reports, two contact reports, five memoranda, one email, one employee warning notice, and one termination notice (pl. resp. m.s.j. 17-18, attachments 4-6; Nesbitt aff., ex. A-P). Nesbitt admitted that the reason he instructed other members of management to prepare observation notes[2] was because of the meeting he, Jones, Abernathy, and Bowie had with the plaintiff on June 19, 2006 (pl. resp. m.s.j. 19; Nesbitt dep. 39-41).

## APPLICABLE LAW

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1)there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law.  As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id*. at 257.  In determining whether a genuine issue has been raised, the court

---

[2]In an observation report dated June 21, 2006, Nesbitt noted that on June 15th he observed the plaintiff fail to interact with Maurice for a period of 27 minutes.  In an observation note dated June 20, 2006, Mary Gleason noted that she observed the plaintiff for 28 minutes, and she saw the plaintiff have only one verbal contact with Maurice during that time.  In an observation noted dated June 21, 2006, Abernathy stated that on June 19th she observed the plaintiff smoke a cigarette outside for several minutes after Maurice had already gone into the building (pl. resp. m.s.j., attachment 4, doc. 45).

must construe all inferences and ambiguities against the non movant and in favor of the non moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. V. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id*. At 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's positions is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e). Accordingly, when rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at trial on the merits.

## ANALYSIS

*Public Policy*

The plaintiff's first cause of action alleges that she was terminated for reporting an incident of alleged abuse of one of the defendant's consumers by another employee. Under South Carolina common law, an at-will employee may have a tort cause of action for wrongful discharge where his or her discharge "constitutes [a] violation of a clear mandate of public policy." *Antley v. Shepherd,* 532 S.E.2d 294, 297 (S.C. Ct. App. 2000) (quoting *Ludwick v. This Minute of Carolina, Inc.*,337 S.E.2d 213 (1985)). "The exception has been applied to situations where an employer requires an employee to violate a criminal law, and situations where the reason for the employee's termination was itself a violation of the criminal law, but it has never been limited to such situations." *Id.* (quoting *Garner v. Morrison Knudsen Corp.,* 456 S.E.2d 907 (1995)). The "public policy exception" to the at-will doctrine is to be very narrowly applied. *See Merck v. Advanced Drainage Systems, Inc.*, 921 F.2d 549, 554 (4th Cir. 1990).

In approximately 2004, the plaintiff told her immediate supervisor about an incident involving another employee and a consumer. However, the plaintiff stated that she was not reporting "abuse." Nevertheless, the Human Resource Manager at the time spoke to the employees allegedly involved and found the plaintiff's allegations to be unsubstantiated (Jones aff. ¶  6). The plaintiff did not "report" the abuse to any law enforcement or regulatory agency[3] (pl. dep. 52-53).

The alleged abuse incident was brought up again in the June 15, 2006, meeting between the plaintiff and Martha Jones. Jones, who was not the Human Resource Manager at the time of the initial report of the 2004 incident, investigated the matter and took the plaintiff

---

[3]In 2004, South Carolina Code Annotated Section 43-35-25 required certain persons, including social workers and caregivers, who have reason to believe that a vulnerable adult has been or is likely to be abused, neglected, or exploited to report the incident within 24hours or the next business day to the Long Term Care Ombudsman Program for incidents occurring in facilities and to the Adult Protective Services Program for incidents occurring in all other settings.

to the Anderson County Sheriff's Office to file an incident report. The only evidence cited by the plaintiff in support of her claim is the temporal proximity between her report and her termination from employment. However, the cases she cites in support of her argument are civil rights cases. This court has found no case law stating that the causation element of this tort claim can be satisfied by temporal proximity alone. Again, there is no evidence that the plaintiff's termination was in retaliation for the 2004 or 2006 reports of the alleged abuse incident in 2004. Based upon the foregoing, summary judgment should be granted on this claim.

**Title VII**

The plaintiff alleges that she was terminated from employment because of her race in violation of Title VII. Under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973), the allocation of proof is as follows: (1) the plaintiff must first establish a *prima facie* case of discrimination; (2) if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate a legitimate non discriminatory reason for its actions; and (3) if the defendant carries this burden, the plaintiff must then establish by a preponderance of the evidence that the reason articulated by the employer is a pretext to mask unlawful discrimination. *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (quoting *McDonnell Douglas Corp v. Percy Green*, 411 U.S. 792, 802-03 (1973)).

Pursuant to this framework, in order to maintain a claim for discrimination in the enforcement of employee disciplinary measures, the plaintiff must prove: "(1) that she is a member of [a protected class]; (2) she was qualified for her job and her job performance was satisfactory; (3) she was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances." *Bryant v. Bell Atlantic, Inc.*, 288 F.3d 124, 133 (4th Cir. 2002) (citing *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993)).

The defendant argues that the plaintiff cannot meet the second element of a *prima facie* case by showing that her job performance was satisfactory. This court agrees. The defendant contends that the plaintiff was not fulfilling the Board's expectations regarding Maurice, because she was observed on several occasions away from Maurice and taking unauthorized breaks. The plaintiff, albeit in the context of her pretext argument,[4] argues that the defendant did not tell her she could not take her normal smoke break (pl. resp. m.s.j. 12-14). However, the undisputed evidence shows that on July 17, 2006, the plaintiff was given a written memorandum that stated she was to have one 15-minute personal break without Maurice, she was to be no more than three yards away from Maurice at all times, Maurice was not to be taken on smoke breaks with anyone, and the plaintiff was not to take any consumers with her on a smoke break (Nesbitt aff., ex. N). The only reasonable inference from this memo is that the plaintiff could only be away from Maurice during her one 15-minute personal break. Two days later, on July 19, 2006, the plaintiff was given another written memorandum setting her daily personal break from 10:35 a.m. until 10:50 a.m. On that same day, the plaintiff was seen on a smoke break at approximately 2:05 p.m. Maurice was *not* with her, and the plaintiff had another consumer with her on the smoke break (Cole dep. 21). The plaintiff had previously been counseled and given an oral reprimand in December 2005 for leaving Maurice unattended and for taking excessive smoke breaks (Nesbitt aff., ex. L). Based upon the foregoing, this court finds that the plaintiff cannot meet the second element of a *prima facie* case of race discrimination.

---

[4]In the context of her *prima facie* evidence argument, the plaintiff contends that under the second element she need only show that she was qualified for her position. She claims that the fact that the defendant employed her for four years in the position satisfies this element. Clearly, it does not. The plaintiff must show that at the time of her termination she was performing her job at a level that met the Board's legitimate expectations for job performance. *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 514-15 (4th Cir. 2006) ("In such cases, the prima facie case requires the employee to demonstrate 'that he was "qualified" in the sense that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative.'") (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1013 (1st Cir. 1979)).

The plaintiff next alleges that she was terminated from employment in retaliation for reporting to Jones that she felt she was being treated differently because of her race. In order to establish a *prima facie* case of retaliation, the plaintiff must show that "'(1) she engaged in a protected activity; (2) the employer took adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action.'" *Matvia v. Bald Head Island Mgmnt., Inc.,* 259 F.3d 261, 271 (4th Cir. 2001) (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001)). The opposition clause makes it "unlawful ... for an employer to discriminate against any ... employe[e] ... because he has opposed any practice made ... unlawful ... by this subchapter." 42 U.S.C. § 2000e-3(a). "'When an employee communicates to her employer a belief that the employer has engaged in ... a form of employment discrimination, that communication" virtually always "constitutes the employee's opposition to the activity.'" *Crawford v. Metropolitan Government of Nashville and Davidson County, Tenn.*, No. 06-1595, 2009 WL 160424, at *3 (S. Ct. Jan. 26, 2009) (quoting Brief for United States as *Amicus Curiae* 9)).

It is unclear from the evidence before the court whether the plaintiff in her meeting with Jones complained that she was being treated differently because of her race. There is some evidence that in the subsequent meeting attended by the plaintiff, Jones, Nesbitt, Abernathy, and Bowie, the issue of race was discussed. Specifically, the plaintiff's supervisor, Abernathy, testified that in the meeting with Jones , Nesbitt, and Bowie, the plaintiff raised an issue or concern about being treated differently based on her race. She noted, "Everybody was shocked that she would have said something like that. That's the first time, you know, first time we had heard it" (Abernathy dep. 65). "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close' . . . ." *Clarke County School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2002) (citing *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A.10 1997) (3-month

period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992) (4-month period insufficient)).  Here, viewing the evidence in a light most favorable to the plaintiff, she complained of race discrimination approximately one month prior to being terminated from employment.  Based upon the foregoing, this court finds that she can establish a *prima facie* case of retaliation.

The defendant has come forward with a legitimate, nondiscriminatory reason for the plaintiff's termination from employment.  Accordingly, the burden shifts to the plaintiff to show pretext.  In *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000), the Supreme Court reiterated that evidence of pretext, combined with the plaintiff's *prima facie* case, does not compel judgment for the plaintiff, because "[i]t is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination."  *Id.* at 147 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519) (emphasis in original).  However, the Court also stated that, under the appropriate circumstances, "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  *Id*.  It is the plaintiff's burden to create an inference that the defendant's proffered reason is a pretext for intentional discrimination.  *See id*. at 147-48.  Pretext analysis does not convert Title VII into a vehicle for challenging unfair – but nondiscriminatory – employment decisions.  *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir. 1989).  Conclusory allegations, without more, are insufficient to preclude the granting of the defendant's summary judgment motion.  *Ross*, 759 F.2d at 365.

The plaintiff argues that she can show the defendant's stated reason for her termination from employment is pretext for discrimination because the defendant's reasons for her termination have changed.  Specifically, the plaintiff notes Nesbitt testified that the termination was the result of the plaintiff's refusal to follow instructions at the end of the "counseling session" on July 19, 2006 (Nesbitt dep. 9).  The plaintiff further notes that Jones testified in her deposition that the specific reason for firing the plaintiff was that she had "four

12

warnings in two years," as noted on the termination form, which she claimed constituted "having more warnings than our policy allows" (Jones dep. at 7, 61).  Jones testified in her affidavit that she based the termination decision on:  (1) the plaintiff's actions and behavior during the July 19th counseling session; (2) Jones' review of the plaintiff's file, which she claimed reflected "repeated insubordination, failure to perform assigned job duties, not displaying a good job attitude toward coworkers and supervisors, leaving her work station without permission, leaving her individual unattended;" and, (3) the receipt of four warnings in two years (Jones aff. ¶ 10).

The plaintiff further contends that pretext can be shown by the fact that the defendant's policy provides for termination for three write-ups in two years, but she was allowed to accumulate four write-ups, and was terminated only after she engaged in protected activity (Jones dep. 7-8).

Lastly, the plaintiff contends that the sudden escalation of negative documentation following her protected activity is evidence of pretext.  Between July 2002 and June 15, 2006, the defendant created eight documents relating to corrective or disciplinary action issued to the plaintiff (*see* pl. resp. m.s.j. 17-18).  Between the plaintiff's June 15, 2006, meeting with Jones and her termination on July 19, 2006, a one-month period, the defendant created 13 negative documents regarding the plaintiff, including one set of supervisor's notes, three observation reports, two contact reports, five memoranda, one email, one employee warning notice, and one termination notice (pl. resp. m.s.j. 17-18).  The plaintiff points out that Nesbitt admitted that the reason he instructed other members of management to prepare observation notes was because of the meeting he, Jones,  Abernathy, and Bowie had with the plaintiff on June 19, 2006 (pl. resp. m.s.j. 19; Nesbitt dep. 39-41).

Based upon the foregoing and viewing the evidence in a light most favorable to the plaintiff, it appears to this court that the plaintiff has presented sufficient evidence of pretext to survive summary judgment on the Title VII retaliation claim.

13

**FMLA**

The FMLA provides eligible employees of a covered employer the right to take unpaid leave for a period of up to 12 work weeks in a 12-month period for, among other things, a serious health condition. 29 U.S.C. § 2612(a)(1). A serious health condition means "an illness, injury, impairment, or physical or mental condition" that involves inpatient care at a hospital as well as a period of incapacity of more than three consecutive calendar days. 29 C.F.R. § 825.114(a)(1), (a)(2)(ii). An eligible employee is someone who has been employed by an employer at least 12 months, worked at least 1,250 hours in the previous 12 months, and the employer employs at least 50 employees at the worksite or within 75 miles of the worksite. 29 U.S.C. § 2611(2). The FMLA makes it unlawful for an employer to "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under 'no fault' attendance policies." 29 C.F.R. § 825.220(c). Moreover, employers are prohibited from inducing employees to waive their rights under the FMLA. *Id.* § 825.220(d).

To establish a claim for retaliation under the FMLA, the plaintiff may rely on the *McDonnell Douglas v. Green,* 411 U.S. 792 (1973) ,proof mechanism. *Yashenko v. Harrah's NC Casino Company LLC,* 446 F.3d 541, 551 (4th Cir. 2006). To state a *prima facie* case of retaliation, the plaintiff must show that (1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action. *See Dodgens v. Kent Mfg. Co.*, 955 F. Supp. 560, 565 (D.S.C. 1997). If she succeeds in establishing a *prima facie* case, the defendant has an opportunity to present a legitimate, nondiscriminatory reason for its employment action. If the defendant does so, the presumption of unlawful discrimination created by the *prima facie* case drops out of the picture, and the burden shifts back to the plaintiff to show that the given reason was a pretext for discrimination. *Yashenko*, 446 F.3d at 551.

14

According to the plaintiff, she submitted a request for FMLA leave and submitted the required medical certification (Jones dep. 53). Leave was ultimately approved for the time period from June 28, 2006, through July 11, 2006 (Jones dep. 49). She was terminated from employment on July 19, 2006.

The plaintiff argues that she can establish a causal connection, and thus a *prima facie* case, based upon the close temporal proximity between her FMLA leave and her termination. "While evidence as to the closeness in time 'far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality.'" *Yashenko*, 446 F.3d at 551 (quoting *Williams v. Cerberonics*, Inc., 871 F.2d 452, 457 (4th Cir.1989)). Based upon the foregoing, the plaintiff can establish a *prima facie* case under the FMLA. Furthermore, based upon the pretext analysis offered above, this court recommends that summary judgment be denied as the plaintiff's FMLA retaliation claim.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, this court recommends that the defendant's motion for summary judgment (doc. 37) be granted in part and denied in part as set forth above.

s/William M. Catoe
United States Magistrate Judge

January 29, 2009

Greenville, South Carolina

15